Wilshire and Western Sandwiches, Inc. v. Commissioner.
Wilshire & Western Sandwiches, Inc. v. Commissioner
Docket No. 10638.
United States Tax Court
1948 Tax Ct. Memo LEXIS 146; 7 T.C.M. (CCH) 406; T.C.M. (RIA) 48123; June 29, 1948
Martin H. Webster, Esq., 639 S. Spring St., Los Angeles, Calif., and Jacob Shearer, Esq., for the petitioner. R. E. Maiden, Jr., Esq., for the respondent. DISNEY
Memorandum Findings of Fact and Opinion DISNEY, Judge: This proceeding involves deficiencies of $599.87 and $782.72 in income tax for the years 1942 and 1943, respectively, and a deficiency of $168.31 in declared value excess profits tax and $1,797.05 in excess profits tax for 1943. The issue is whether the respondent erred in disallowing as deductions for interest $1,500 in 1942 and $1,443.36 in 1943. The stipulation of facts filed by the parties is incorporated herein by reference as part of our findings of fact. Findings of Fact The petitioner was incorporated on March 24, 1941, under the laws of California, with an *147 authorized capital stock of 7,500 shares of common stock, par value $10 each, for the purpose of engaging in the drive-in restaurant business. The incorporators of petitioner were M. A. McDonnell, William H. Simon, Mike Lyman, and Harry B. Carpenter. Its articles of incorporation empowered petitioner, among other things, to borrow money and issue its notes therefor. It kept its books and prepared its returns on the accrual basis. It filed its returns for the taxable years with the collector for the sixth district of California. Discussions resulting in the formation of petitioner started the early part of 1941. The original plan was to operate a combination drive-in and restaurant and cocktail room at Wilshire and Western Avenues, as a substitute for an old drive-in restaurant then being operated by Carpenter a block away. A lease was negotiated under the terms of which the lessor was to erect suitable improvements at a cost of about $75,000. Carpenter did not desire to operate a combination restaurant on account of its size. In the meantime, Simon, acting for himself, negotiated a lease for another corner of Wilshire and Western Avenues for the purpose of operating a drive-in restaurant. *148 Thereafter, but before petitioner was incorporated, the interested parties abandoned the plan under consideration and decided to construct a drive-in restaurant on the lot covered by the lease negotiated by Simon. About April 1941 petitioner's incorporators discussed for the first time the question of financing the construction of the restaurant out of advances by them to petitioner for the purchase of its stock and as loans. The original intention was to make advances totaling $30,000 for stock and loans on an equal basis. The individuals desired to be in a position to participate with general creditors for part of their investment in the event petitioner's business was not successful. In addition, they regarded a loan to be a better investment than stock to obtain returns on and repayment of their capital outlay. The individuals discussed the question of borrowing money from a bank and decided that they would rather receive the interest than to have petitioner pay it to a bank. They also discussed the tax benefit that would accrue to them and petitioner under the plan. Simon, who with his brother Mike Lyman was regarded as a unit in the transaction, considered his contemplated *149 loan to be a safe investment. The same individuals, or some of them, entered into similar transactions for the same reasons with nine other corporations, one each in 1937 and 1939, six in 1941, and one in 1942. In all except two of the transactions, the notes received for loans were in proportion to the stock received. Simon negotiated for, and on April 26, 1941, entered into, a lease for a corner lot at Wilshire Boulevard and Western Avenue, Los Angeles, for a period of 15 years. The lease provided for the improvement of the premises by a drive-in restaurant building at a cost of not less than $30,000. The lease was acquired by Simon with the understanding that he would assign it to petitioner, and was assigned by him to petitioner in July 1941. The understanding was that Carpenter would supervise the construction of the building and operate the business. Three of the four individuals estimated that the improvements, including equipment, would cost about $30,000. Carpenter, the other individual, first believed that the cost would be about $50,000, and in July 1941, concluded that the cost would be $38,000 or $39,000. Simon and Carpenter estimated that the cost of the equipment would *150 about equal the cost of the building. About June 15, 1941, bids were solicited for the construction of the building on the leased premises, and on July 10, 1941, a contract was entered into for the construction of a building at a cost of $22,651. The construction work was substantially completed about October 25, 1941, and the restaurant was opened for business about November 5, 1941. The incorporators of petitioner made the following payments, totaling $55,000, to petitioner in 1941 under the plan previously adopted by them. McDonnell
Simon
Lyman
Carpenter
May
$ 3,333.33
$ $ $ June
1,666.67
1,666.66
3,333.34
August
2,500.00
2,500.00
September
5,000.00
5,000.00
October
2,500.00
2,500.00
November 13
2,500.00
2,500.00
5,000.00
November 19
10,000.00
5,000.00 The payments made on November 13th and 19th were agreed upon at an informal meeting held on November 12. At the same meeting the parties reached an agreement on the division of the advances between stock and notes. At the time the advances prior to November were made, the individuals intended that stock would be issued for one-half thereof, and notes for *151 the remainder. No receipts were given by petitioner for the advances. The money was first used to pay for the cost of preparing plans and specifications for the building, and thereafter for the construction of the building and the equipment installed therein. The amount of $38,114.68 was spent in 1941 for the building and $17,515.78 for equipment, a total of $55,630.46. In January 1942, the additional amount of $2,375 was spent for building costs and, in that and the next month the additional amount of $7,787.26 was spent for equipment. An expenditure of $55,000 was necessary to place the restaurant in condition to open for business. About February 1, 1942, petitioner borrowed $10,000 from its stockholders to pay bills outstanding for the construction of the building and equipment of the restaurant. Carpenter and McDonnell each loaned one-third of the amount and Simon and Lyman each a one-sixth. Carpenter did not advise the other stockholders of the need for the money until a short time before the loans were made. The loans were paid on September 7, 1942, without interest. About July 14, 1941, petitioner, pursuant to a resolution adopted by its Board of Directors on that day, *152 filed an application with the Department of Investment of the State of California for permission to issue 1,500 shares of its stock for cash to its incorporators, and G. C. Jobson, and the remainder of its stock when authorized by its Board of Directors. The application recited that petitioner proposed to borrow from the stockholders or incorporators an additional amount sufficient to complete the building and equip it for the operation of a restaurant. At the same meeting, Carpenter was elected president and Simon vice president of petitioner. On July 17, 1941, the Commissioner of Corporations authorized petitioner to sell to the individuals named in its application for cash, at par, not to exceed 7,500 shares of its stock. At a meeting of the Board of Directors of petitioner, the membership of which included the four incorporators, on November 13, 1941, a resolution was adopted, in accordance with an agreement reached at an informal meeting the previous day, to issue to the incorporators for advances made by them promissory notes, totaling $25,000, maturing in two years with interest at the rate of 6 per cent per annum, payable quarterly, and stock, totaling $30,000, as follows: *153 Carpenter
McDonnell
Simon
Lyman
Stock
$10,000.00
$10,000.00
$5,000.00
$5,000.00
Notes
8,333.34
8,333.33
4,166.67
4,166.66
The stock and notes authorized by the resolution were issued under date of November 13, 1941, and were delivered by December 5, 1941. In case of default in the payment of interest, the notes were to be immediately due and payable at the option of the holder. On November 25, 1941, 50 shares each of the stock issued to Simon and Lyman were transferred to Joseph Lardemar, in accordance with a gift made of the stock prior to November 13, 1941. Carpenter expected the notes to be paid if petitioner had funds for that purpose. Simon expected the notes to be paid out of current earnings and would not have insisted upon payment if payment would have caused financial hardship to petitioner. Amounts, totaling $3,055.86, were paid to the noteholders on December 1, 1943, as interest on the notes to November 30, 1943. Like payments, aggregating $682.10, were paid on March 23, 1945. The amounts were entered on the books of petitioner as a charge to an account under the name of "Interest Payable Accrued," which account was opened in *154 February or March 1943, as of the close of 1942, with a credit to the account as interest accrued on the notes to December 31, 1942. The face amount of the notes was paid in full by payments of $10,000 each, on April 21, 1943, and May 23, 1944, and $5,000 on March 23, 1945. The payment to the holder of each note was in proportion to his holdings of all of the notes. In October 1941, Carpenter requested a certified public accountant to outline a set of books for petitioner's bookkeeper to install and use. After receiving the minutes of petitioner, the accountant prepared a list of entries. The journal entry showed that petitioner was incorporated with a capital of $75,000, consisting of 7,500 shares of a par value of $10 each. The outline of accounts to be used included an account for notes payable. Carpenter did not inform the accountant that part of the advances made by the incorporators was to be treated as loans to the corporation. Petitioner's account under the name of "Capital Stock Unissued" contained a charge of $75,000 and a credit of $55,000 on December 31, 1941. Its account "Stock Subscriptions Receivable" contained at that time a charge of $55,000 and a credit for the *155 same amount. The books also showed capital stock of $75,000, of which $55,000 was set aside against an account under the name of "Cash Special $55,000." The books did not, on December 31, 1941, reflect any notes payable to stockholders. Sometime between January 15 and March 7, in 1942, the accountant took a trial balance from petitioner's books for the purpose of preparing petitioner's income tax returns for 1941. The balance sheet included in the income and declared value excess profits tax return listed as an asset capital stock subscriptions in the amount of $55,000 and as a liability a like amount for capital stock. The return was signed by Carpenter, as president, and H. B. Carpenter, Jr., as treasurer, without objection to the return as prepared by the accountant or reading the return. Petitioner's president was aware that the affidavit he signed contained a statement that the return was correct. In April or May 1942, petitioner employed another accountant to examine its books. The accountant had knowledge that the stockholders of petitioner held notes of the corporation. He ascertained from a trial balance taken as of December 31, 1941, that the books did not reflect the notes *156 issued to the stockholders under the date of November 13, 1941, and erroneously reflected the capital stock outstanding. After discussing the matter with Carpenter and Simon, the accountant made entries in the books to reflect notes outstanding of $25,000 and capital stock outstanding of $30,000. While the accountant was preparing petitioner's income tax return for 1942, he ascertained that no amount had been accrued for interest on the notes. An appropriate account was then opened and the amount of $1,687.50 was entered therein as interest accrued on the notes to the close of 1942. Thereafter interest was accrued on the notes monthly. The earned surplus account of petitioner discloses credit balances of $2,468.16, $9,740.40, $17,980.01, $45,752.61, $51,349.06, and $59,289.40 at the close of the years 1941 to 1946, inclusive. The account contains no charge for dividends. Petitioner's president, who testified at the hearing, was at an undisclosed time indicted in a Federal district court in California for filing false and fraudulent individual returns and like returns for a firm doing business under the name of Carpenter's Drive-In. At the trial, Carpenter entered a plea of nolo *157 contendere and paid a fine imposed by the court. No sentence of imprisonment was imposed by the court. In its returns for 1942 and 1943 the petitioner claimed $1,500 and $1,443.26, respectively, as deductions for interest on the notes held by its stockholders. In his determination of the deficiencies the respondent held that the amounts were not deductible under section 23 (b) of the Internal Revenue Code. Opinion The disagreement between the parties is whether the notes issued to the stockholders of petitioner constitute indebtedness within the meaning of section 23 (b) of the Internal Revenue Code, as contended by petitioner, or investments in and contributions to capital of petitioner, as contended by the respondent. Petitioner contends that Cleveland Adolph Mayer Realty Corporation, 6 T.C. 730, is determinative of the issue here. The respondent cites Edward G. Janeway, 2 T.C. 197, aff'd., 147 Fed. (2d) 692, as having facts similar to those prevailing here. Promissory notes were issued for the amounts; the instruments and accrued interest thereon were belatedly entered in the corporate books *158 as such; interest on and principal of the notes were eventually paid; and there is testimony in the record that the parties intended the amounts as loans. The question is factual and such evidence must be weighed with other facts of record to determine the true character of the amounts. Joseph B. Thomas, 2 T.C. 193; Edward G. Janeway, supra; Doyle v. Mitchell Bros. Co., 247 U.S. 179. The general plan was decided upon prior to any business activity of petitioner and was intended to meet capital outlays which are usually paid out of invested capital and/or secured indebtedness. Similar arrangements were made by the stockholders, or some of them, in connection with other corporations formed to engage in the restaurant business. No evidence was offered to establish that the individuals were lenders of money other than under plans such as the one here under consideration. The advances here have few of the usual characteristics of commercial loans entered into in arm's length transactions. All of the amounts were paid in to provide petitioner with funds to start business, hence all of it was working capital. The original plan was to take stock *159 and notes on an equal basis and three of the four interested parties estimated that an expenditure of about $30,000 would be sufficient to open the restaurant for business. The amount of $55,000 was required to place the restaurant in condition to commence business, yet there was no agreement to advance the final $30,000 paid in until November 12, 1941, which was a week after the restaurant was opened for business, and until then no final agreement was reached on the proportions of the advances to be regarded as loans and for the purchase of stock, or the terms of the loans. The plan finally adopted and made effective on the division of the advances between stock and notes was not in accordance with the agreement originally entered into, which discloses that the parties were at all times in a position to divide the advances between stock and notes in any proportion. The portion regarded as a loan by each stockholder was in direct proportion to his holding of stock. Carpenter committed petitioner to pay additional construction costs, in the amount of about $10,000, without the consent of the other incorporators. Such amount was borrowed, without interest, from the stockholders in *160 direct proportion to stockholdings. The loans altered the ratio of stock to loans from 30-25 to 30-35, and is evidence that the individuals were not dealing with petitioner as "mere lenders." Some of the funds were advanced as early as May 1941, yet no interest thereon was incurred by petitioner prior to November 13, 1941. In the meantime, there was no agreement on when interest would start, the rate of interest, or an agreement with petitioner on when the loans would mature, contrary to the manner loans are generally made. The treatment of the notes on the books and payment of the obligations is significant. The notes were not entered in the books until April or May 1942, and although interest was payable quarterly, none was accrued on the books until 1943 and no interest was paid until December 1, 1943, or more than two years after the notes were executed. The terms of the instruments gave to the holders thereof the right to declare the principal and interest immediately due and payable upon default in the payment of interest when due. No evidence was offered that any of the note holders exercised the right. The final payment on the notes was not made until March 23, 1945, or more *161 than sixteen months after maturity, and the payment made each time to each was in direct proportion to his holdings of all of the notes. No evidence was offered to show any demand for payment at maturity. The $10,000 borrowed about February 1, 1942, without interest, was paid in full by one payment made on September 7, 1942, which was about fifteen months before the first interest payment was made on the notes. No additional capital was invested in the business, with the result that the notes were paid, as the parties intended, out of operating income. The intent of the parties with respect to a part of the advances as bona fide loans, is reflected in testimony of Simon, who, with his brother, regarded as a unit in the transaction, and Carpenter. The former testified that he expected the note to be paid at maturity, but would not have insisted upon payment if payment would result in financial hardship to petitioner. The latter did not expect payment unless petitioner had funds. It is apparent from the testimony that they did not intend to assert rights of a bona fide lender; instead regarded the amounts as being subject to the risks of the business and looked to repayment out of *162 corporate earnings. There was no need to acquire an additional proprietary interest for the amounts, in view of the fact that the stock issued for remainder of the advances gave each stockholder the same control he would have had had stock alone been issued. The petitioner had earned surplus of about $51,000 by the close of 1945, or double the amount of its outstanding stock, yet paid no dividends on its stock during that period, which strongly indicates that the stockholders looked to the notes for income on their investments and a partial return of capital. Testimony is present that hazards of the restaurant business was one of the reasons for the plan adopted and carried out. Other testimony requires us to refuse to accept it at its face value. Advances totaling $65,000 were eventually made in a venture which three of the interested parties thought could be started in business by a capital outlay of only about $30,000, and the third, Carpenter, about $38,000. Simon thought the loan was safe and all of them preferred the plan over a bank loan for the amount covered by the notes. Such opinions and action is opposed to the idea that the parties had any great concern about the financial *163 success of the business. Further discussion of the facts seems unnecessary. The substance of the plan, which must prevail over the form thereof, was to make capital contributions, subject to an understanding of the participants, that they would be repaid in full if the petitioner had sufficient earnings to make the payments without financial hardship to it. Accordingly, Decision will be entered for the respondent.